OPINION {¶ 1} Plaintiffs-appellants Rosemarie Rossetti and Michael Leder appeal from the April 9, 2003, Judgment Entry of the Licking County Court of Common Pleas granting the Motions for Summary Judgment filed by defendants-appellees Ohio Power Company, ACRT and Nelson Tree Service.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On June 13, 1998, appellant Rosemarie Rossetti and her husband, appellant Michael Leder, were riding bicycles on the T.J. Evans Bike Trail in Licking County when a linden tree collapsed and fell into an Ohio Power line and across the bike path. The tree then hit appellant Rossetti, causing serious injuries, including paralysis.
 {¶ 3} The linden tree that fell was located approximately 51 feet off of the bike trail on land owned by Karen Matz and John Skowronski which is adjacent to the bike trail. The tree, which was approximately 80 years old and stood 101 feet tall, leaned over the power lines. According to Dr. Sydnor, appellants' expert, there was a huge cavity in the base of the tree and the "tree was hollow for . . . three, four feet up." Thomas Sydnor Deposition at 41. The tree had been hollowed out at the base for, at a minimum, in excess of 20 years and there was decay around the base that had existed for almost the entire life of the tree. Both the decay and the hollowed out portion of the base faced away from the bike path. According to Dr. Sydnor, the tree was rooted in the stump and the "root had actually grown through the stump and was growing up the hill. The root is — the failure of that root was what caused the failure of the tree. That was the only thing that was actually holding the tree up." Id at 41-42.
 {¶ 4} Appellee Ohio Power had an easement[1] over the property owned by Karen Matz and John Skowronski and the bike trail for the purpose of trimming and/or removing trees along the bike trail that interfered with its power lines. The bike trail and the property owned by Karen Matz and John Skowronski are separated by a wire fence. The linden tree was not located within Ohio Power's easement, but rather was located approximately 51 feet from the bike trail and 20 to 25 feet from the wire fence.
 {¶ 5} Appellee Ohio Power trims and removes the trees in and around its easement on a three to five year trimming cycle. In accordance with such cycle, the trees adjacent to the bike trail were inspected and maintained in 1988-1989, between 1990 and1992 and in 1995. As part of its tree trimming program, appellee Ohio Power contracted with both appellee ACRT and appellee Nelson Tree. Appellee ACRT, pursuant to its contract with appellee Ohio Power, hired work planners who, as part of the 1995 trimming/removing cycle, patrolled the electric lines and identified which trees in the easement needed trimmed or removed. The work planners would mark such trees with paint. While trees that were to be trimmed were marked with a blue dot, trees that were to be removed were marked with red paint. In turn, appellee Nelson Tree Service performed the actual trimming or removal for the 1995 cycle.
 {¶ 6} Subsequently, appellants filed a complaint in the Licking County Court of Common Pleas against appellees, among others.[2] Appellees filed Motions for Summary Judgment. In addition, appellees ACRT and Nelson Tree filed motions to strike the affidavit of Dr. Sydnor, appellants' expert.
 {¶ 7} As memorialized in a Judgment Entry filed on April 9, 2003, the trial court granted the motion to strike Dr. Sydnor's affidavit, finding that the same was not admissible under Civ.R. 56. In addition, the trial court granted appellees' Motions for Summary Judgment, holding that "it was not foreseeable that the Linden tree would fall onto the bicycle path and cause a person physical harm" and that "[g]iven the lack of evidence beyond mere inference indicating the Linden tree was trimmed by the utility-Defendants under the tree-trimming program, Plaintiffs cannot establish proximate cause."
 {¶ 8} It is from the trial court's April 9, 2003, Judgment Entry that appellants now appeal, raising the following assignments of error:
 {¶ 9} "I. The trial court erred to the substantial prejudice of plaintiffs-appellants by granting the motions for summary judgment filed by defendants-appellees Ohio Power Company, ACRT, Inc. and Nelson Tree Service, because genuine issues of fact exist in this case regarding whether those defendants negligently trimmed the tree, and whether it was foreseeable that the tree would fall on someone, such as the plaintiff-appellants [sic] Rosemarie Rossetti, who was using the bike path.
 {¶ 10} "II. The trial court erred to the substantial prejudice of plaintiffs-appellants by striking the affidavit of plaintiffs-appellants' expert, Dr Sydnor."
 I {¶ 11} Appellants, in their first assignment of error, argue that the trial court erred in granting appellees' Motions for Summary Judgment. We disagree.
 {¶ 12} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party,Inc. (1987), 30 Ohio St.3d 35, 36, 506 N.E.2d 212. As such, we must refer to Civ.R. 56 which provides, in pertinent part:
 {¶ 13} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."
 {¶ 14} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall, 77 Ohio St.3d 421,429, 1997-Ohio-259, 674 N.E.2d 1164, citing Dresher v. Burt,75 Ohio St.3d 280, 1996-Ohio-107, 662 N.E.2d 264. It is based upon this standard that we review appellants' first assignment of error.
 {¶ 15} At issue in the case sub judice is whether appellees were negligent. In a negligence case, a plaintiff must prove that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the plaintiff suffered harm; and (4) the harm was proximately caused by defendant's breach of duty. Mussivand v. David (1989), 45 Ohio St.3d 314, 318,544 N.E.2d 265. The existence of a duty depends on the foreseeability of the injury. Id. at 320-321, citing Menifee v. Ohio WeldingProducts, Inc. (1984), 15 Ohio St.3d 75, 77, 472 N.E.2d 707. "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." Id.
 {¶ 16} Appellants, in the case sub judice, specifically argue that there is a genuine issue of material fact with respect to whether it was foreseeable that the linden tree would fall on someone using the bike path. We, however, concur with the trial court that it was not reasonably foreseeable that the tree would fall onto the bicycle path and cause a person physical harm.[3] John Skowronski, who owned the private property on which the tree was located, testified during his deposition that there was no reason to notice the tree before it fell because "it looked healthy. I mean, there was no reason to notice it. It wasn't as if the crown was brown or the bark was peeling." Deposition of John Skowronski at 27. Dr. Sydnor, appellants' own expert, agreed during his deposition that "[e]arlier on in the growth of this tree it would have been more readily identified as a hazard tree than later on." Deposition of Dr. Sydnor at 126. While he testified that the tree would have been identified as a hazard in the 1980's, Dr. Sydnor further testified that it was not reasonably foreseeable in 1980 that the linden tree was going to fall within the next 18 years. Thus, as noted by appellee Nelson Tree in its brief, "[w]hen the tree was in its most dangerous state, in the 1980's, it was not reasonably foreseeable that it would fall within the next eighteen years." In addition, as noted by the trial court, according to Dr. Sydnor, appellants' own expert, it was not reasonably foreseeable that the tree would fall on appellant Rossetti in 1998. The following is an excerpt from Dr. Sydnor's deposition testimony:
 {¶ 17} "Q. Okay. Say you looked at this tree in the summer of 1995. Would you be able to say it was reasonably foreseeable that it was going to fall in the next four years?
 {¶ 18} "A. Not in the next four years, but it was reasonably foreseeable it would fall, yes.
 {¶ 19} "Q. Some day. I got you.
 {¶ 20} "A. The question as to what minute is open to interpretation, you know." Deposition of Dr. Sydnor at 127.
 {¶ 21} In addition, Dr. Sydnor, during his deposition, testified that the linden tree was leaning for its entire life and that the tree had been hollowed out at its base for, at a minimum, in excess of 20 years, and that the decay around the tree's base had been there "[w]ell in excess of 20 years, probably 40 . . . Maybe 80." Deposition of Dr. Sydnor at 94. Dr. Sydnor also testified that, using the formula that was generally accepted in his field, the linden tree had a live crown-ratio of 66%, which was "good." Deposition of Dr. Sydnor at 100. According to Dr. Sydnor, the tree was either the dominant or co-dominant tree in the canopy, which indicates that the tree has to, at some point, be fairly healthy. Thus, as noted by the trial court in its decision, "[a]ccording to Dr. Sydnor, even if Defendants OPC [Ohio Power Company], ACRT, and Nelson Tree Service actually examined and trimmed this specific Linden tree in 1995, as Plaintiffs suggest, and observed the decay, hollowed cavity, and poor root structure, it was still not reasonably foreseeable the tree would fall in the next four years, which would bring Defendants to the next trimming cycle." While, as is stated above, Dr. Sydnor did testify that the tree would fall some day, such testimony does not create a genuine issue of material fact since most trees will eventually fall.
 {¶ 22} Moreover, appellee ACRT, in support of its Motion for Summary Judgment, attached an affidavit from Ray Hannebique, a Right of Way Program Developer with Davey Resource Group who was formerly employed by ACRT as a supervisor to the Utility Forestry Pre-Planner. Hannebique, in his affidavit, stated, in relevant party, as follows:
 {¶ 23} "5. That Matt Winland's[4] responsibility as a Utility Forestry Pre-planner in June 1995 was to visually inspect trees under and/or adjacent to American Electric Power/Ohio Power facilities for potential tree situations that would allow contact or damage to the electrical facilities for the specified cycle length;
 {¶ 24} "6. That the tree that is the subject of this lawsuit was an American Linden of mature height.
 {¶ 25} "7. Based upon my observations the tree was the dominant canopy tree in its surroundings;
 {¶ 26} "8. That this tree had a healthy live to dead crown ratio;
 {¶ 27} "9. It was not reasonably foreseeable by Matt Winland that the American Linden tree would fall within the specified cycle length because at the time of his inspection there were no visual signs of decline."
 {¶ 28} Furthermore, Dennis Welch, a Licking County Park District Ranger who saw the tree shortly after it fell, testified that the "crown, the top of the tree, was full of leaves, green leaves. . . . . it looked like a healthy tree." Deposition of Dennis Welch at 31-32.
 {¶ 29} Moreover, with respect to appellee Nelson Tree, we find that the trial court did not err in granting summary judgment since appellee Nelson Tree, as part of its contract with Ohio Power, had no duty to inspect the trees on and adjacent to Ohio Power's easement. Rather, appellee Nelson Tree merely trimmed or removed the trees that were marked by appellee ACRT. Thus, appellee Nelson had no discretion with respect to which trees were to be trimmed or removed.
 {¶ 30} Based on the foregoing, we find that the trial court did not err in granting appellees' Motions for Summary Judgment since there was no genuine issue of material fact with respect to whether it was reasonably foreseeable that the tree would fall. As noted by the trial court, "[b]ecause it was not reasonably foreseeable that the tree would fall, according to Plaintiffs' own expert evidence, no duty arose on behalf of Defendants to take any action with regard to the Linden tree."
 {¶ 31} Appellants' first assignment of error is, therefore overruled.
 II {¶ 32} Appellants, in their second assignment of error, argue that the trial court erred by striking the affidavit of Dr. Sydnor, appellants' expert. We disagree.
 {¶ 33} The trial court, in the case sub judice, granted the motions to strike Dr. Syndor's affidavit, finding that it fell short of the requirements set forth in Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 593-594,113 S.Ct. 2786, 2797. In Miller v. Bike Athletic Co. 80 Ohio St.3d 607,1998-Ohio-178, 687 N.E.2d 735, the Ohio Supreme Court identified the following four factors to be considered in evaluating the reliability of scientific evidence: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. These factors were adopted from Daubert, supra. at 593-594. Both the United States Supreme Court in Daubert and the Ohio Supreme Court in Miller were careful to emphasize that none of the factors is a determinative prerequisite to admissibility. State v. Nemeth, 82 Ohio St.3d 202, 211,1998-Ohio-371, 694 N.E.2d 1332, (citing Miller at 612-613,Daubert at 593.)
 {¶ 34} Of importance in this case was the live crown ratio of the linden tree. The following testimony was adduced when Dr. Sydnor was asked during his deposition what the live crown ratio of the linden tree was:
 {¶ 35} "A. Well, now part of that was cut off before I — part of the crown was cut off. But estimating you know, from the overall heighth, I would guess that the live crown ratio was something along the order of 30 percent, something like that.
 {¶ 36} "Q. Okay. Well, did you figure the live crown ratio?
 {¶ 37} "A. Ratio of overall heighth of the plant to the first live branch.
 {¶ 38} "Q. Okay.
 {¶ 39} "A. In general that would be correct. In this particular instance the utility pruning is part of the — it would be part of what's resulting in a lower than expected live crown ratio.
 {¶ 40} "Q. But the general way to figure out a live crown ratio of the tree is —
 {¶ 41} "A. The height of the tree.
 {¶ 42} "Q. Compared to where the first branch is?
 {¶ 43} "A. Right. Take the heighth of the first branch and divide by that heighth of the tree.
 {¶ 44} "Q. And this was about 101 feet, correct?
 {¶ 45} "A. Correct.
 {¶ 46} "Q. All right. And the first branch that you were aware of was around 45 feet, correct?
 {¶ 47} "A. It said 33, but part of that is that the first live branch — but you also have to modify that.
 {¶ 48} "Q. Doctor, try to listen to my question, okay?
 {¶ 49} "A. Okay.
 {¶ 50} "Q. My question is the height of the tree is 101 feet, correct?
 {¶ 51} "A. Correct.
 {¶ 52} "Q. And the first branch that you measured was 45 feet, correct?
 {¶ 53} "A. I think it said 33.
 {¶ 54} "Q. Thirty-three?
 {¶ 55} "A. Yeah.
 {¶ 56} "Q. So using the formula that you used, the livecrown ration would be —
 {¶ 57} "A. Sixty-six.
 {¶ 58} "Q. — would be around 66?
 {¶ 59} "A. Arguably, yeah.
 {¶ 60} "Q. Is that a good live crown ration, 66 percent?
 {¶ 61} "A. That's good. But that's — I don't think that's what was there, because what they were doing is forcing a lot of small branches and that kind of thing. So what I gave you is — what I would estimate the live crown ratio from — because I think they kept pruning that off. In fact, they clearly kept pruning that off because of the pollarding.
 {¶ 62} "Q. Let's back up. Using the formula that's generallyaccepted in your field the live crown ratio would be 66 percent,correct?
 {¶ 63} "A. Correct.
 {¶ 64} "Q. You believe from what you've seen it might have been less than that; is that right?
 {¶ 65} "A. I think they kept whacking off the lower branches on the high light side of the plant, and that would be evidenced here.
 {¶ 66} "Q. Okay. You think they kept on whacking off the branches, but the branches did start at 33 feet?
 {¶ 67} "A. Yeah. And that would have been on the low light side of the plant." Deposition of Dr. Sydnor at 98-101. (Emphasis added.)
 {¶ 68} In contrast, in his affidavit, which was submitted in support of appellants' Motion for Summary Judgment, Dr. Sydnor stated as follows:
 {¶ 69} "1. On Tuesday, September 17, 2001, my deposition was taken, over the course of six hours, in the above captioned case.
 {¶ 70} "2. Pages 99-101 of the deposition transcript attached hereto accurately reflect my testimony that day regarding the live crown ratio of the Linden Tree that is the subject of this case.
 {¶ 71} "3. In that deposition I described the method by which a tree's live crown ratio is calculated as taking the height of the first branch and dividing it by the height of the tree.
 {¶ 72} "4. In that deposition I described the height of the Linden tree to be 101 feet.
 {¶ 73} "5. In that deposition I described the height of the first branch to be 33 feet.
 {¶ 74} "6. Based upon that information I concluded that the Linden tree's live crown ratio to be sixty-six percent (66%).
 {¶ 75} "7. Calculating the height of the live crown ratio based upon the height of the first branch at 33 feet includes the area of pollarding (where utility pruning had forced the growth of small branches).
 {¶ 76} "8. A more accurate calculation is reached by using the height of the first branch after the pollarding — 60 feet.
 {¶ 77} "9. Using a first branch height of 60 feet reduces the live crown ratio to 40.
 {¶ 78} "10. A live crown ratio of forty percent (40%) is another indication that the tree had increased instability. It is also an indication that this tree did not have enough foliage necessary to maintain a viable plant.
 {¶ 79} "11. A live crown ratio of forty percent (40%) is consistent with my opinion that the Linden tree was unstable."
 {¶ 80} As noted by the trial court, Dr. Sydnor, in his affidavit, does not indicate that his opinion, that the live crown ration of the linden tree was 40%, is based on the generally accepted method for measuring a tree's live crown ratio. In short, Dr. Sydnor does not state in his affidavit that using the height of the first branch after pollarding is a generally accepted method for determining such ratio. In contrast, during his deposition, Dr. Sydnor did testify that the generally accepted method for determining the live crown ratio is to take the height of the first branch of a tree and divide it by the length of the tree.
 {¶ 81} Based on the foregoing we concur with the trial court that "[b]ecause Dr. Sydnor's opinion in his Affidavit is not based on the generally accepted method for measuring a tree's live crown ratio, and because the Affidavit opinion contradicts the generally accepted method Dr. Sydnor testified to in his deposition, . . . it falls short of the requirements espoused inDaubert and is not admissible under Civ.R. 56."
 {¶ 82} Since the trial court, therefore, did not err in granting the motions to strike Dr. Sydnor's affidavit, appellants' second assignment of error is overruled.
 {¶ 83} Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed.
Gwin, P.J. and Farmer, J. concur.
[1] The easement is 10 to 20 feet wide — 5 to 10 feet wide on either side of the power lines.
[2] Appellants also named as defendants the Thomas J. Evans Foundation, Licking County Park District, Environmental Consultants, Karen Matz and John Skowronski. Defendants Thomas J. Evans Foundation, Licking County Park District, and Environmental Consultants were all voluntarily dismissed prior to the Judgment Entry granting summary judgment to appellees. Karen Matz and John Skowronski were later dismissed from the appeal.
[3] Based on our holding with respect to foreseeability, we need not address issues relating to whether appellee Nelson negligently trimmed the tree and whether Ohio Power's duty to protect its power lines from interference extends to appellant. Appellant conceded at oral argument that Ohio Power had no duty to look for trees outside its easement that might fall on lines, but alleges that once Ohio Power inspected such a tree and saw that it was dangerous, Ohio Power had the duty to remove the tree.
[4] Matt Winland was a work planner for appellee ACRT in 1995, who patrolled the electric lines in the area where appellant Rossetti was injured.