[Cite as *State v. Durham*, 2024-Ohio-3289.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2023 AP 10 0050 |
| ENRIQUE DURHAM | : |  |
|  | : |  |
| Defendant-Appellant | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING: Appeal from the Tuscarawas County Court of Common Pleas, Case No. 2022 CR 08 0291

JUDGMENT: Affirmed in part; Reversed in part

DATE OF JUDGMENT ENTRY: August 26, 2024

APPEARANCES:

For Plaintiff-Appellee

RYAN STYER
Prosecuting Attorney
By: KRISTINE BEARD
Assistant Prosecutor
125 E. High Avenue
New Philadelphia, OH 44663

For Defendant-Appellant

ELICE HARRIS
Harris Law Firm, LLC
6480 E. Main Street, Suite A
Reynoldsburg, OH 43068

*Gwin, P.J.*

**{¶1}**   Defendant-appellant Enrique Durham ["Durham"] appeals his convictions and sentences after a jury trial in the Tuscarawas County Court of Common Pleas.

*Facts and Procedural History*

**{¶2}**   H.C. and Durham met when H.C. was 17 years old and Durham was 19 years old. 3T. at 369[1]. H.C.'s daughter, T.D., was two years old at the time. 3T. at 369. During their ensuing relationship, Durham changed T.D.'s diapers, bought her clothes and presents, dressed her, cooked for her, and helped her potty train. 5T. at 575. Durham and H.C. eventually had their own daughter, K.D. and, by 2022, the couple had been together for eleven years. 3T. at 369; 5T. at 569. Although T.D. was not his biological daughter, Durham treated T.D. and K. D. the same. 5T. at 571. The family moved into a trailer in Sandy Valley and T.D. attended school in the Sandy Valley school district. 3T. at 370; 383. In the trailer H.C. and Durham had their own bedroom and bathroom and the girls each had their own bedroom and shared a bathroom. 2T. at 269-270. The girls' bedrooms were on the opposite side of the trailer from H.C. and Durham. Id.; 3T. at 374.

*H.C. discovers Durham has been sexually abusing T.D.*

**{¶3}**   On June 14, 2022, at around 8:30 p.m. the family went to bed. 3T. at 374. H.C. woke up to find Durham gone and went to see if he was outside the trailer smoking a cigarette. Id. The trailer was dark. H.C. noted that both doors to the trailer were locked and then went to check on the girls. Id. She observed K.D. in her room sleeping. H.C. encountered Durham rushing out of T.D.'s bedroom muttering something about a

---

[1]   For clarity, the transcript of Durham's jury trial will be referred to as "__T.__" signifying the volume number and the page number of the transcript. All references are to the version of the transcript filed with Durham's Motion to Supplement the Record granted by this Court by Judgment Entry filed May 9, 2024.

shelf had fallen. 3T. at 374. H.C. entered T.D.'s bedroom and observed one of the two shelfs on the wall still in place, while the other had fallen to the floor. Id. at 375. H.C. told T.D. to get out of bed and help take the second shelf down from the wall. Id. When T.D. looked at H.C. blankly, H.C. repeated her request for help with the shelving. At that time, T.D. told her mother that she could not help her because "dad was rubbing lotion on her privates." Id. H.C. drew back the covers to see that T.D. had no shorts or underwear on. Durham had returned to the room during this time standing behind H.C. saying, "[T.D.], come on T.D." 3T. at 375. H.C. smelled lotion on Durham's hand and on T.D.'s "privates." Id. Later that same night T.D. told H.C. that it had happened another time when she was in the shower and another time at night. Id. at 379. She told her mother that "his fingers were in between my lips." Id.

*T.D. testifies that Durham sexually abused her*

{¶4}   T.D. was born July 20, 2009. 2T. at 267. T.D. testified that, on the night of June 14, 2022, Durham came into her room and told her to shut the T.V. off. Id. at 276. T.D. turned the T.V. off. T.D. then went to lay down in her bed. Durham proceeded to go over to where she kept her body lotion, and pumped some lotion into his hand. He then shut the bedroom light off, went over to T.D., pulled her pants and her underwear down and started rubbing her "V area and then slipped kind of his finger inside and then go back out and rub." 2T. at 276-277. Durham stopped when he heard H.C. walking down the hallway. As he attempted to rush out of the bedroom, Durham bumped the shelves on the bedroom wall, causing one to fall. T.D. heard Durham tell H.C. that he was going to get his tools to fix the shelf. Id. T.D. testified that when her mother asked her to help with the shelf, her mother got mad and threw

the blankets off T.D. revealing that T.D. was naked from the waist down. T.D. testified that Durham stood behind her mom motioning her not to talk. Id. at 277.

**{¶5}** T.D. testified that during 2022 when the school year was ending, Durham touched her while she was naked in the shower, squeezing her breasts, rubbing her vaginal area and putting his fingers inside her vaginal area. 2T. at 293. T.D. testified that Durham's fingers were "[o]utside and then a little bit inside and then right back outside." Id. at 294.

**{¶6}** T.D. admitted that she told Deputy Balash that no digital penetration occurred on June 14, 2022, because she was scared and felt uncomfortable, even though Durham was not present, and Balash did nothing to make her uncomfortable. 2T. at 312-314.

*The investigation*

**{¶7}** On June 15, 2022, H.C. reported the incident to the Tuscarawas County Sheriff's Office. 3T. at 382. Deputy Balash was assigned to the investigation. 4T.at 478-479. Deputy Balash was working as a resource officer for the Sandy Valley School District and planned to meet with H.C. and T.D. at his Sandy Valley office. 4T. at 481. During his interview, T.D. denied that digital penetration had occurred during the June 14, 2022 incident. Id. at 516-517.

**{¶8}** After speaking with H.C. and T.D., Deputy Balash went to the home, took photos (State's Exhibit 12), and collected T.D.'s shorts and underwear (State's Exhibit 13). The physical evidence was sent to BCI for forensic analysis. Deputy Balash also told H.C. to take T.D. to Akron Children's Hospital for a physical exam. 4T. at 482.

{¶9} T.D.'s physical examination was normal. 2T. at 238-241. At Akron Children's Hospital, Erika Eisel conducted a forensic interview with T.D. 2T. at 253. During the interview, T.D. disclosed that Durham came into her bedroom, took off her bottoms and underwear, and touched and digitally penetrated her vaginal area. 2T. at 260; 312-313. The forensic interview was digitally recorded and played for the jury. 2T. at 257; State's Exhibit 3.

{¶10} After the forensic interview and physical exam, T.D. was referred to Lighthouse Family Center for a trauma evaluation. Carrie Schnirring, from Lighthouse Family Center, conducted T.D.'s trauma evaluation and prepared an expert report. 2T. at 186; State's Exhibit 1. T.D. was diagnosed with Posttraumatic stress disorder, Adjustment disorder with Depressed Mood, r/o Major Depressive Disorder. 2T. at 209-211; State's Exhibit 1 at 11.

*Durham contacts Deputy Balash*

{¶11} On June 22, 2022, Durham called Deputy Balash to schedule an interview. 4T. at 501-502. The interview, which was recorded audibly, took place in Deputy Balash's police vehicle parked outside Durham's home. Id.; State's Exhibit 14. Deputy Balash described Durham's face as twitching or jerking involuntarily during the interview. Id. at 503. During the interview, Durham admitted applying lotion to T.D.'s breasts and vaginal area. He further admitted that it was possible that the wash rag may have gone inside T.D.'s vagina as he scrubbed her while she was showering. Id. at 511-12. He denied intentional digital penetration, and admitted lying to H.C. to avoid conflict. The entire one hour-forty-minute interview with Durham was played for the jury. 4T. at 505-506.

*Durham testifies at trial*

{¶12} Durham admitted that on June 14, 2022, he went into T.D.'s dark bedroom, took off T.D.'s clothing, pumped the lotion bottle and rubbed lotion on T.D.'s whole body. 5T. at 580-582; 595-597; 617. He denied that he digitally penetrated T.D. Id. at 598-599. He further admitted to telling Deputy Balash that he would scrub T.D. in the shower including her vaginal area. Id. at 605-606. He described for the jury how he would put the washcloth between T.D.'s legs but not inside her vagina. 5T. at 622. Durham testified that he describes the "vaginal area" as the area below the belly button and above the genitalia. Id. at 618-619. He insisted that it would not be on or inside the lips. Id.

*The charges*

{¶13} On August 8, 2022, Durham was indicted by the Tuscarawas County Grand Jury for two counts of Rape, one count occurring between January 1, 2022 and June 13, 2022, and the second count occurring June 14, 2022, of a victim less than 13 years of age, in violation of R.C. 2907.02(A)(1)(b) / (B), both first degree felonies, two counts of Gross Sexual Imposition of a child less than 13 years of age, one count occurring between January 1, 2022 and June 13, 2022, and the second count occurring June 14, 2022, in violation of R.C. 2907.05(A)(4) / (C)(2), both third degree felonies and, one count of Endangering Children, occurring between January 1, 2022 and June 13, 2022, in violation of R.C. 2919.22(B)(1) / (E)(2)(d) a second-degree felony.

*Verdict and sentence*

**{¶14}** At the conclusion of the evidence, the jury found Durham guilty as charged in the indictment. Sentencing was deferred for a presentence investigation.

**{¶15}** On September 6, 2023, the trial judge sentenced Durham to concurrent life terms with the possibility of parole after ten years on Counts 1 and 3; forty-eight-month terms on Counts 2 and 4 to be served concurrently with each other and consecutively to Counts 1 and 3; and six years on Count 5 to be served concurrently with Counts 2 and 4 and consecutively to Counts 1 and 3, for a total aggregate indeterminate term of 16 years to life imprisonment.

*Assignments of Error*

**{¶16}** Durham raises six Assignments of Error,

**{¶17}** "I. ENRIQUE DURHAM WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE OHIO AND UNITED STATES CONSTITUTIONS WHEN UNADMITTED, UNREDACTED AND HIGHLIGHTED EXPERT REPORTS WERE INADVERTENTLY SUBMITTED TO THE JURY.

**{¶18}** "II. ENRIQUE DURHAM'S CONVICTION FOR ENDANGERING CHILDREN, IN VIOLATION OF R.C. 2919.22(B)(1) AND R.C. 2919.22(E)(2)(D), A FELONY OF THE SECOND DEGREE, IS IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶19} "III. THE TRIAL COURT COMMITTED PLAIN ERROR AND EXPOSED ENRIQUE DURHAM TO MULTIPLE PUNISHMENTS FOR THE SAME OFFENSE IN VIOLATION OF HIS RIGHTS UNDER THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION BY FAILING TO MERGE HIS CONVICTIONS AS ALLIED OFFENSES OF SIMILAR IMPORT.

{¶20} "IV. ENRIQUE DURHAM WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT.

{¶21} "V. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN SENTENCING ENRIQUE DURHAM.

{¶22} "VI. ENRIQUE DURHAM WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AS A RESULT OF THE CUMULATIVE ERRORS AT TRIAL."

I.

{¶23} In his First Assignment of Error, Durham contends that it was reversible error to allow inculpatory versions of Carrie Schnirring's report [State's Exhibit 1] to be taken into the jury room and considered by the jury when such exhibits were never received in evidence.

{¶24} Carrie Schnirring, from Lighthouse Family Center, conducted T.D.'s trauma evaluation and prepared an expert report. 2T. at 186; State's Exhibit 1. At the close of evidence on day four of Durham's jury trial, after the jury had been excused for the day, the trial judge and both attorneys discussed redacting State's Exhibit 1. 4T.

at 525. The next morning, the trial judge pointed out to counsel seven areas of State's Exhibit 1 that he believed needed to be discussed. 5T. at 533. The judge noted that he had marked a copy of State's Exhibit 1, and that he provided a copy to counsel and gave each one the opportunity to mark that copy for use in discussions. Id. at 533.

{¶25} After extensive discussion on the record, the parties came to an agreement. Id. at 533-541. At the conclusion of the discussion the prosecutor asked, and the trial judge agreed that the original, unredacted copy of State's Exhibit 1 would be kept for the record. Id. at 541. The trial judge then stated,

> And, I have a copy that you gave me that we will attempt at the redacting on first so we can take a look at that, okay? Okay, we have a plan in place regarding redacting. Next, when we concluded yesterday, the State was resting subject-it rested subject to the admission of its exhibits. All of them have been admitted as presented except State's Exhibit 1 and [sic.] will be *a redacted copy that would be provided to the jury. The original will also be kept, excuse me, with the record but not provided to the jury.*

5T. at 541-542. Emphasis added. On July 26, 2024, the Court's Administrative Assistant filed a "Memo" that states, "A manila envelope containing an un-redacted copy of State's Exhibit #1 which was not given to the Jurors in the above-referenced case was placed in the Confidential File of this administrative office." [Docket Entry No. 162].

### Standard of Review

{¶26} The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a defendant accused of a state criminal violation shall be tried before a panel of fair and impartial jurors. *See Duncan v. Louisiana*, 391 U.S. 145, 88

(1968), *and State v. King*, 10 Ohio App.3d 161(1st Dist. 1983). *See, also*, Ohio Constitution, Article I, Section 10. The evidence against the accused must be developed on the witness stand and in open court. *Turner v. Louisiana*, 379 U.S. 466, 473 (1965). The judgment reached in a case should be based only on evidence and argument in open court, and not by any outside influence. *Patterson v. Colorado*, 205 U.S. 454, (1907); *Sheppard v. Maxwell*, 384 U.S. 333, 351(1966). For this reason, a verdict based upon evidence that was not admitted during trial would violate Due Process.

        **First Issue for appellate review:** *Whether the record supports the assertion that exhibits not admitted into evidence were taken into the jury room*

**{¶27}** Durham's sole support for his belief that the jury was given other copies of Carrie Schnirring's report that had been used during the trial judge and counsel's discussions concerning redacting the exhibit is the following, "Undersigned counsel received 103 pages of trial exhibits including two copies of a Redacted State's Ex. 1, one copy of a Highlighted State's Ex. 1 and one copy of an Unredacted State's Ex. 1. Counsel was advised the Unredacted State's Ex. 1 was not maintained or retrieved from a separate envelope." Appellant's brief at n. 2.

**{¶28}** One area where this Court does not have discretion to overlook, is when facts, argument or evidence has been presented in the appellate brief that were not presented to the trial court during the proceedings in the lower court. In *State v. Hooks*, 92 Ohio St.3d 83(2001), the Supreme Court noted, "a reviewing court cannot add matter to the record before it that was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter. *See, State v. Ishmail*, 54 Ohio St.2d 402(1978)." It is also a longstanding rule "that the record cannot be enlarged by factual

assertions in the brief." *Dissolution of Doty v. Doty*, 1980 WL 350992 (4th Dist. Feb. 28, 1980), citing *Scioto Bank v. Columbus Union Stock Yards*, 120 Ohio App. 55, 59 (10th Dist. 1963). New material and factual assertions contained in any brief in this court may not be considered. *See, North v. Beightler*, 2006-Ohio-6515, ¶ 7, *quoting Dzina v. Celebrezze*, 2006-Ohio-1195, ¶ 16.

{¶29} It is speculative to conclude that the jurors were given other versions of Carrie Schnirring's report [State's Exhibit 1]. The only evidence that they were sent into the jury room is the suggestion that they were because they are contained in the trial record. Nowhere does the record indicate that the exhibits were taken into the jury room during trial. *State v. Cooper,* 52 Ohio St.2d 163, 179 (1977), *vacated on other grounds 438 U.S. 911(1978).*

{¶30} The trial judge said only the redacted version would go to the jury. 5T. at 541-542. Only one of the documents referenced by Durham contains an original, red sticker marked, "State's Exhibit 1". We have nothing in the record to suggest that the jury was given anything other than the redacted version of Carrie Schnirring's report. In an appeal, all reasonable presumptions consistent with the record will be indulged in in favor of the regularity of the proceedings below. *In re Sublett*, 169 Ohio St. 19, (1959); *State v. Grant,* 67 Ohio St.3d 465, 483 (1993). Keeping exhibits with the record does not mean the exhibits were given to the jury; rather, it means the exhibits were kept with the record for purposes of appellate review.

{¶31} There is nothing in the record to show that the jury examined any of the other papers. Durham's assertions do not appear in the trial court record. This Court may not go beyond the record when reviewing a matter on direct appeal, and consequently,

we must find that this matter is more appropriate for review in a petition for post-conviction relief made pursuant to R.C. 2953.21. *See, State v. Stevens*, 1995 WL 495835, *2 (5th Dist. May 26, 1995)[2].

**{¶32}** The record in this case does not support Durham's argument that other versions of State's Exhibit 1 were taken into the jury room and considered by them during trial.

**Second Issue for appellate review:** *Whether, assuming arguendo the documents were taken to the jury room, did that error result in prejudice to Durham's substantial rights*

**{¶33}** However, even if we were to assume *arguendo*, that the documents were taken into the jury room, Durham would fair no better.

**{¶34}** The law requires that items exposed to the jury must have been properly received in evidence in open court, "It is perfectly plain that the jury room must be kept free of evidence not received during trial, and that its presence, if prejudicial, will vitiate the verdict." *Dallago v. United States*, 427 F.2d 546, 553 (D.C.Cir. 1969) (footnote and citations omitted). *Accord, United States v. Lee,* 573 F.3d 155, 162 (3rd Cir. 2009).

**{¶35}** It is the responsibility of counsel for both sides in a trial to examine the items to be presented to the jury for their consideration to ensure that the jury is not exposed to matters not admitted into evidence. *State v. Estrada*, 69 Haw. 204, 221(1987); *Government of the Virgin Islands v. Joseph*, 685 F.2d 857 (3rd Cir. 1982); *United States v. Finnegan,* 204 F.2d 105, 115 (8th Cir. 1953); *State v. Ritchie,* 556 So.2d 651, 658(La.

---

[2] "A petition for post-conviction relief is a means to reach constitutional issues that would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction. *State v. Murphy* (Dec. 26, 2000), Franklin App. No. 00AP–233." *State v. Perry,* 2011-Ohio-274, ¶ 12 (5th Dist.).

1990). Failure to do so may mean that a reviewing court can only reverse for plain error. Id. *See also, United States v. Friedland,* 660 F.2d 919, 928 (3rd Cir. 1981).

**{¶36}** In the case at bar, if the other versions of Carrie Schnirring's report were taken to the jury room, then, obviously, neither counsel fulfilled their due diligence to review the items admitted into evidence before allowing them to be taken to the jury room.

**{¶37}** In a series of cases involving jurors possibly being exposed to documents or other evidence in the jury room that had not been admitted at trial, the Ohio Supreme Court has emphasized that the defendant must demonstrate prejudice resulting from the error.

**{¶38}** In *State v. Cooper*, the defendant was convicted of aggravated murder with the specifications that he purposely caused the death of the victim while committing the offense of kidnapping and while attempting to commit rape. 52 Ohio St.2d 163, 166 (1977), *vacated on other grounds, 438 U.S. 911(1978).* On appeal, one of Cooper's contentions was that it was reversible error to allow inculpatory exhibits to be taken into the jury room and considered by the jury when such exhibits were never received in evidence. Id. at 180. The exhibits were photographs of the scene of the crime, and, the search warrant, an envelope of cloth fibers, a list of items recovered from appellant's car, and a supplementary report made by a sheriff's deputy after appellant's arraignment. Id. The Ohio Supreme Court noted that,

> Nowhere does the record indicate that the exhibits were taken into the jury room during trial.

Clearly, the error of the trial court in not formally admitting the above exhibits in evidence was harmless, since all these exhibits were merely cumulative in nature.

52 Ohio St.2d at 180. In *State v. Froman,* Froman was charged with aggravated murder with death penalty specifications. 2020-Ohio-4523, ¶ 27. One of his contentions on appeal was that the trial court erred by allowing the jury to view multiple videotapes of his phone conversations with a [police officer friend] thereby violating his due-process rights and the best-evidence rule. Id. at ¶95. The Court noted that, "Over Froman's objection, state's exhibit No. 51 was played for the jury, and state's exhibit No. 50 was admitted into evidence and sent back with the jury for its deliberations. The trial court explained that state's exhibit No. 50, which did not include the closed captioning, was being admitted to 'leav[e] it to [the jurors'] own interpretation of what was said.' State's exhibit Nos. 47 through 49 and 51 were not admitted into evidence, but they were included as part of the record for appellate purposes." Id. at ¶ 97. In overruling the assignment of error, the Ohio Supreme Court emphasized that "Froman failed to show that he was prejudiced." Id. at ¶ 100.

{¶39} In *State v. Grant,* a jury convicted Grant of two counts of aggravated murder and one charge of aggravated arson. Each aggravated murder charge contained two death-penalty specifications, one alleging a course of conduct involving the purposeful killing of two or more people, and another alleging murder during an aggravated arson. 67 Ohio St.3d 465, 469 (1993). One of Grant's contentions on appeal was that the fire chief's ninety-six color slides, together with a black and white photograph of the corpses,

were taken into the jury room although not admitted into evidence. Id. at 483. The Ohio

Supreme Court overruled his assignment of error,

> This is a speculative claim, and, in an appeal, all reasonable
> presumptions consistent with the record will be indulged in in favor of the
> regularity of the proceedings below. *In re Sublett* (1959), 169 Ohio St. 19, 7
> O.O.2d 487, 157 N.E.2d 324; *State v. Frost,* supra, 14 Ohio App.3d at 321,
> 14 OBR at 387, 471 N.E.2d at 173. Furthermore, no prejudice resulted. The
> photograph was repetitive, and the jury had already seen the slides; other
> evidence as to the fire scene was abundant.

67 Ohio St.3d at 483.

**{¶40}** Thus, in each of the cases, the Ohio Supreme Court emphasized that the

burden was upon the defendant to demonstrate prejudice. Because Dunham failed to

exercise due diligence to examine the evidence before it was taken to the jury room to

ensure that only admissible evidence would be given to the jury, and in light of the

aforementioned Ohio Supreme Court cases, we review the submission of the other

versions of Carrie Schnirring's report for plain error.

*Plain error*

**{¶41}** Crim.R. 52 affords appellate courts limited power to correct errors that

occurred during the trial court proceeding. The Rule distinguishes between errors to which

a defendant objected at trial [Crim.R. 52(a)] and errors that a defendant failed to raise at

trial. [Crim.R. 52(b)]. The main distinction between plain-error review, which is the

standard employed when a defendant failed to object at trial, and harmless-error review,

which is employed when a defendant did object, is the party that bears the burden. *See*

*State v. Jones*, 2020-Ohio-3051, ¶ 17-18. Under plain-error review, the defendant bears the burden to demonstrate the requirements for review whereas under harmless-error review, the state bears the burden to demonstrate that the error did not affect the defendant's substantial rights. Id. at ¶ 17-18. *See, State v. Bond*, 2022-Ohio-4150, ¶7. While Crim.R. 52(a) precludes error correction only if the error "does ***not*** affect substantial rights," (emphasis added), Crim.R. 52(b) authorizes no remedy unless the error ***does*** "affec[t] substantial rights." (Emphasis added.). *State v. Perry,* 2004-Ohio-118, ¶15 (2004), *quoting United States v. Olano*, 507 U.S. 725, 734-735 (1993).

{¶42} "To establish plain error under Crim.R. 52(b), [Durham] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis omitted.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, *quoting State v. Rogers*, 2015-Ohio-2459, ¶ 22. *Accord State v. Bailey*, 2022-Ohio-4407, ¶ 8. These elements are "conjunctive," meaning "all three must apply to justify an appellate court's intervention." *Bailey* at ¶ 9, *citing State v. Barnes,* 94 Ohio St.3d 21, 27(2002). Intervention by an appellate court for plain error "is warranted only under exceptional circumstances to prevent injustice." Id. at ¶ 8, *citing State v. Long*, 53 Ohio St.2d 91(1978), paragraph three of the syllabus.

{¶43} In order to show that an error affected substantial rights, the defendant must demonstrate "a reasonable probability that the error resulted in prejudice - the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis deleted.)  *State v. Rogers*, 2015-Ohio-2459, ¶ 22, *citing United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, (2004) (construing Fed.R.Crim.P. 52(b), the federal analog

to Crim.R. 52(B)). *Bond* at ¶ 22. The Court in *Rogers* reaffirmed that even if an accused shows the trial court committed plain error affecting the outcome of the proceeding, the appellate court is not required to correct it. Id. at ¶ 23. The Supreme Court stated:

> [W]e have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at 27, 94 Ohio St.3d 21, 759 N.E.2d 1240, *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Rogers*, ¶ 23; *State v. Perry*, 101 Ohio St.3d 118, 120 (2004).

*How this issue arose in the trial court*

{¶44} Prior to trial, Durham filed a motion in limine asking the court to limit any prior bad acts testimony regarding domestic violence. [Docket Entry No. 140]. In the motion Durham referenced the child victim's trauma evaluation report prepared by Carrie Schnirring at Lighthouse Family Center and reports made to Ms. Schnirring regarding domestic violence in the family. [State's Exhibit 1]. The state filed a response. [Docket Entry No. 142]. In the response, the state contended that the evidence was relevant to explain how the will of a victim of a rape can be overborne, and how a partner could be manipulated into supporting the abuser. Prior to the start of trial, the trial judge granted the motion finding that because force was not alleged during the sexual assaults, the evidence was barred by Evid.R. 404. 2T. at 169-171. Based on the trial judge's ruling, Carrie Schnirring was instructed not to testify about any domestic violence in T.D.'s life and home. 2T. at 182-183.

**{¶45}** Prior to T.D.'s testimony, the state objected to Durham's having cross-examined Schnirring about an alleged false police report made by T.D. 2T. at 249-250. The state contended that to explain the situation, it would be necessary to bring up the threats Durham made to T.D., which the state could not do because of the trial judge's ruling on the motion in limine. Id. at 250-251. The trial judge indicated he would review the ruling if the matter was brought up by the defense. Id. at 252.

**{¶46}** During his cross-examination of T.D., Durham conceded that he opened the door to the domestic violence incidents because he was seeking to elicit testimony from T.D. that she filed a false police report concerning her allegations that her parents abused her. 2T. at 307. He further withdrew the motion in limine because he was "opening the door" to the domestic violence testimony. Id. at 309-319; 335; 425. The trial judge indicated he would permit the state to recall Schnirring. Id.; 2T. at 317. The state requested the trial judge instruct the jury that they were not permitted to talk about the domestic violence with Schnirring because of the motion in limine. 2T. at 317. The trial judge permitted the state to inform T.D. that they no longer had to abide by the prior ruling and she could testify concerning domestic violence in the home. Id. at 318. However, the trial judge indicated that he would not permit testimony about every bad act Durham had ever done. Id. at 336. Ultimately, the state elected not to recall Schnirring. 3T. at 424-425.

*The record on appeal*

**{¶47}** Contained within the record transmitted to this Court are the following documents,

1. A copy of the report of Carrie Schnirring that contains no red "State's Exhibit 1" sticker [the "Original version"];

2. A copy of the report of Carrie Schnirring that contains a photocopy in black of a "State's Exhibit" sticker with a blank exhibit number. This version has areas highlighted- some of which were not redacted, in addition to the areas which were ultimately redacted [the "Highlighted version"];

3. A copy of the report of Carrie Schnirring that contains no red or photocopied "State's Exhibit" or "State's Exhibit 1" sticker, that has the seven areas of redaction obliterated by white correction fluid, frequently referred to by its trade name as "Wit-Out," [the "Wit-Out" version];

4. A redacted copy of the report of Carrie Schnirring that contains a red "State's Exhibit 1" sticker [the "Redacted version"].

*The trial testimony concerning domestic violence*

**{¶48}** At trial, Schnirring testified concerning how threats of violence affect a child and the child's ability to control their environment. 2T. at 189-190. She testified to the effects of returning a child back after the child has "told on" a caregiver. Id. at 190. She further testified that family violence plays into the control of a child. Id.

**{¶49}** Before being relieved of the restrictions imposed by the trial judge's ruling on Durham's motion in limine, T.D. testified that Durham beat her and called her names. 2T. at 278; 291. On cross-examination, T.D. was asked about reporting incidents of violence in the home when she was interviewed at Akron Children's Hospital. Id. at 316; 320 -321. She testified that she had called the police because her mom and Durham were abusing her. Id. at 325. T.D. testified,

Enrique, he was on the camera in the phone and I was doing the dishes, taking care of [K.D.] and taking care of a dog and he starts

threatening to beat on me when he gets home if the things are not right, how he wanted it. Threating to put his hands on me and then he started cussing me out and then I just started having a breakdown and I called grandma to come pick me up.

2T. at 328. T.D. explained that "beat" meant, "Physically hit me with his hands, belt, shoes, anything he can throw at me what he would usually do." Id. She testified that she would get "beat" for not following the rules. Id. at 329. Durham would hit her in her face or anywhere on her body. Id. T.D. further told the jury,

And my mom, she started hitting on me too but he took me by my hair, started beating on me in the living room, threw me over the chair and I peed myself because I was begging for him to stop, then he stopped and then he drag-he drug-my bad-dragged me by my hair, threw me into the bathroom and started throwing my shoes at me, took the cleaner for the bathroom, threw that at me and a toothbrush, also while beating on me, telling me that I had to clean the toilet, sink and bath tub with that and if it's not right, that he would start hitting on me again and then my mom was also upset so she hit on me a little bit but he was mostly the one causing the bruises on me. Also, while cussing me out.

2T. at 330. T.D. testified further,

So, the physical abuse where I started getting hit is when I was younger but he started beating and hitting on my mom and it would get to the point where I don't know if my mom would make it out. So, as I started getting older, I started throwing myself into it when every time I would see

him beat mom even though I would be getting beat too. So, when I started getting around nine, ten, he would start beating me even worse and I started fighting back. One day, when I got out of school, these girls that I didn't like were walking behind me and he thought we were friends. So, he started yelling at me, told me to get in the car. We got home--

2T. at 334. T.D. continued,

The day where they were walking behind me, he took me into the car-He told me to get in the F-in (sic) car and I did and he started yelling at me. We got home, I went to the kitchen, he started cussing me out and he went to go get his belt, he hit me with the belt, and I caught it and I started fighting back and then he used his hands, he made my mouth bleed and I had some bruises on me. So, I was hitting back to the point where his mouth was bleeding also and then I went to my room. I was crying and we were still fighting back and forth. My mom walked in and he was saying that I was – I was abused when I was younger and I didn't mean to take it out on you and I'm sorry.

2T. at 337-338.

{¶50} H.C. testified on cross-examination that it was true that she and Durham beat on T.D. 3T. at 410. They would spank her with their hands, a belt, scream and cuss at her. Id. at 411. The belt left marks on T.D.'s leg. Id at 412.

{¶51} Durham testified that he administered spankings to T.D. 5T. at 573. Sometimes he would spank T.D. with a belt. Id. at 573; 594; 603.

*Durham's contentions*

**{¶52}** We first note that the reference to page 7 of the Highlighted version concerning how other family members felt about Durham, Durham did not ask the trial judge to, and the trial judge did not, redact this paragraph. *See*, Appellant's brief at 8, #1. 5T. at 533-544; Redacted version at 7. The same is true with respect to Durham's contention concerning the Unredacted version and Highlighted version at page 2. *See*, Appellant's brief at 9, #2.

**{¶53}** T.D. testified at trial to Durham pulling her hair and throwing shoes at her. 2T. at 330. *See*, Appellant's brief at 9, #4. T.D. testified concerning the bathroom incident. *See*, Appellant's brief at 9, #3; 2T. at 330. T.D. testified that Durham would call her names. 2T. at 291; *See*, Appellant's brief at 9, #5. T.D. testified that Durham abused her mother, H.C. 2T. at 334; *See*, Appellant's brief at 9, #6; #8; #9, #11. H.C. admitted at trial to hitting T.D. with her hand and a belt. 3T. at 411; *See*, Appellant's brief at 9, #10. Both T.D. and H.C. testified to marks left on T.D. after being disciplined. 2T. at 330; 334; 412; *See*, Appellant's brief at 9, #11; #12. T.D. testified that she would attempt to intervene when H.C. and Durham would fight. 2T. at 334; *See*, Appellant's brief at 9, #14. The only other evidence contained in the Unredacted version and the Highlighted version that is not contained in the Redacted version concerns T.D. sister, K.D. *See*, Appellant's brief at #13; #15.

**{¶54}** Accordingly, as the majority of the redactions from Carrie Schnirring's report were testified to during trial, any versions erroneously submitted to the jury are cumulative and repetitive of the testimony. Any differences were minimal.

**{¶55}** Durham has not demonstrated that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial.

Durham did not dispute the majority of allegations made by T.D. Durham admitted that on June 14, 2022, he got out of bed after his partner fell asleep. He then proceeded to go to the bedroom of his twelve-year-old step-daughter and removed all of her clothes. Durham then pumped lotion onto his hands and proceeded to rub the lotion, from top to bottom, including her breasts and vaginal area, on the naked body of his twelve-year-old step-daughter. When he hears his partner approaching, he flees the room. Durham admitted that he lied to his partner concerning his reason for being in T.D.'s bedroom. He further admitted to washing his twelve-year-old daughter in the shower, including scrubbing her between the legs with a washcloth. 5T. at 622.

{¶56} In addition, because T.D., H.C. and Durham each testified, the jury was able to judge for themselves their appearance on the stand, manner of testifying, the reasonableness of their testimony, the accuracy of memory, frankness or lack of it, and any bias they may have.

{¶57} We find that there was abundant evidence to submit the charges to the jury and to support Durham's convictions. Further, any error in the submission of the other versions of Carrie Schnirring's report did not affect the substantial rights of Durham. The remaining evidence adduced by the state established his guilt beyond any reasonable doubt.

### Conclusion – Durham's First Assignment of Error

{¶58} We hold that it is speculative to conclude that the jurors were given other versions of Carrie Schnirring's report. The only evidence that they were sent into the jury room is the suggestion that they were because they are contained in the trial record.

Nowhere does the record indicate that the exhibits were taken into the jury room during trial. There is nothing in the record to show that the jury examined any of the other papers.

{¶59} Assuming arguendo that exhibits were taken into the jury room and considered by the jury when those exhibits had not been admitted into evidence, we hold that Durham has not demonstrated that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial. We decline to find a manifest injustice warranting the extraordinary step of finding plain error in the submission of the Original version, the Highlighted version, the Wit-Out version and the Redacted version of Carrie Schnirring's report to the jury.

{¶60} Durham's First Assignment of Error is overruled.

II.

{¶61} In his Second Assignment of Error, Durham asserts that the evidence was not sufficient to support his conviction for Child Endangering. Specifically, Durham argues the evidence fails to prove beyond a reasonable doubt the T.D. suffered "serious physical harm" so as to elevate the crime to a felony of the second degree.

**Standard of Appellate Review**

{¶62} The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99 (2013); *Hurst v. Florida*, 577 U.S. 92 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker*, 2016-Ohio-8295, ¶30; *State v. Jordan,* 2023-Ohio-3800, ¶13. "This naturally entails a

review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson*, 2016-Ohio-8448, ¶13.

{¶63} When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, (1997)*; *Walker*, 150 Ohio St.3d at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney*, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 2006-Ohio-5283, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430 (1997); *State v. Montgomery*, 2016-Ohio-5487, ¶74.

**Issue for Appellate Review**: *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Durham was guilty beyond a reasonable doubt of causing T.D. serious physical harm*

**{¶64}** Durham was convicted of Endangering Children in violation of R.C. 2919.22; however, he concedes that the evidence was sufficient to convict him of the offense pursuant to R.C. 2919.22(B)(1). Durham's focus is solely upon the sentence enhancing element,

(E)(1) Whoever violates this section is guilty of endangering children.

(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:

…

(d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

**{¶65}** Durham argues that the state failed to prove that T.D. "suffered from any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment." Accordingly, he argues, the "serious physical harm" enhancement must be vacated and the offense of Child Endangering reduced to a first-degree misdemeanor." Appellant's brief at 20.

**{¶66}** In the case at bar, T.D. was diagnosed with Posttraumatic stress disorder, Adjustment disorder with Depressed Mood, r/o Major Depressive Disorder. 2T. at 209-211; State's Exhibit 1 at 11. T.D.'s depression stemmed from the specific stressors of sexual abuse, her mother's reaction, Children's Service's becoming involved and her mother losing custody of T.D. 2T. at 210. Ms. Schnirring testified

that the longer the sexual abuse goes on, the more severe the posttraumatic stress. Id. at 212. Schnirring testified that T.D.'s age, and her mother's mismanagement of the situation are factors "to how much she's going to have to work in therapy to address these symptoms that she struggled with." Id. at 212. Recovery is further complicated when the perpetrator of the sexual abuse is a person of trust and authority. Id. at 212-213. Schnirring testified that she recommended trauma therapy and that T.D.'s depression symptoms be monitored "pretty closely because she might need to see someone for a consultation regarding medication if the trauma therapy doesn't relieve some of the more severe symptoms of depression." 2T. at 214. Schnirring further testified that the fact that her mother did not believe her and that Children Services had to remove T.D. from her mother's home "suggests that her road to recovery is going to be difficult." Id. at 214. Schnirring recommended that T.D. begin counseling in November-December, 2022. 2T. at 218. T.D.'s counseling was delayed because of scheduling problems brought about because of the pandemic. 2T. at 224-225.

{¶67} The jury was able to view T.D.'s forensic interview at Akron Children's Hospital and review Schnirring's report. State's Exhibit 3; State's Exhibit 1.

{¶68} R.C. 2901.01 statutorily defines "serious physical harm" in relevant part,

(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment.

{¶69} This Court has previously noted the degree of harm which rises to level of "serious" physical harm is not an exact science, given the definition uses terms such as "substantial," "temporary," "acute" and "prolonged." *State v. Holsinger*, 2017-Ohio-1378, ¶35 (5th Dist.). The extent or degree of a victim's injuries is "normally a matter of the weight rather than the sufficiency of the evidence." Id.

{¶70} *State v. Elliott*, involved a man who was convicted of felonious assault after he killed his wife and then allowed his six-year-old son to discover her lying dead in a pool of her own blood. 104 Ohio App.3d 812 (11th Dist. 1995). The son suffered post-traumatic stress disorder ("PTSD") as a result. Id. at 415–16. In *Elliott,* there was conflicting evidence as to whether the child's mental condition required "prolonged psychiatric treatment." 104 Ohio App.3d at 819. However, the court found that the conflicting testimony "does not preclude reasonable minds from finding beyond a reasonable doubt that as a result of discovering his mother's body, [the child] suffered from a mental illness requiring prolonged psychiatric treatment." Id.

{¶71} *State v. Cooper*, involved a mother who was involved in sexually abusing and/or allowing others to sexually abuse her four children. 139 Ohio App.3d 149 (12th Dist. 2000). The children each displayed "a variety of symptoms of mental illness." Id. Even though the expert could not separate the children's sexual abuse from their physical and emotional maltreatment as the cause of their mental illnesses, the Court found that the trial court was not required to acquit, because from the expert's testimony a jury could reasonably find that "appellant caused 'serious physical harm' in the form of mental illness that is prohibited by the felonious assault statute." Id. at 161.

**{¶72}** In the case at bar, a twelve-year-old child suffered repeated instances of sexual abuse at the hands of her step-father. Based upon the evidence presented during trial, it is not unreasonable to conclude that the resulting psychological trauma would be serious and require treatment well into the future.

**{¶73}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Durham did cause serious physical harm to T.D. We hold, therefore, that the state met its burden of production regarding each element of the crime of Endangering Children as a felony of the second degree for which Durham was indicted and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Durham's conviction.

**{¶74}** Durham's Second Assignment of Error is overruled.

III.

**{¶75}** In his Third Assignment of Error, Durham contends the trial judge erred by failing to merge the rape, gross sexual imposition and endangering children convictions because the charges are allied offenses of similar import.

**Standard of Review**

**{¶76}** We review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25. *State v. Williams*, 2012-Ohio-5699, ¶ 1; *State v. Bailey,* 2022-Ohio-4407, ¶6. However, because Durham failed to preserve the issue of merger at trial, we review the issue for plain error. *See State v. Rogers*, 2015-Ohio-2459, ¶ 28 ("the failure to raise the allied offense issue at the time of sentencing forfeits all but plain error"); *Bailey,* 2022-Ohio-4407 at ¶ 7.

*Plain Error*

{¶77}  "To establish plain error, [Durham] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis omitted.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, *quoting State v. Rogers*, 2015-Ohio-2459, ¶ 22. *Accord State v. Bailey*, 2022-Ohio-4407, ¶ 8. These elements are "conjunctive," meaning "all three must apply to justify an appellate court's intervention." *Bailey* at ¶ 9, *citing State v. Barnes,* 94 Ohio St.3d 21, 27(2002). Intervention by an appellate court for plain error "is warranted only under exceptional circumstances to prevent injustice." Id. at ¶ 8, *citing State v. Long*, 53 Ohio St.2d 91(1978), paragraph three of the syllabus.

{¶78}  The main distinction between plain-error review, which is the standard employed when a defendant failed to object at trial, and harmless-error review, which is employed when a defendant did object, is the party that bears the burden. *See State v. Jones*, 2020-Ohio-3051, ¶ 17-18. Under plain-error review, the defendant bears the burden to demonstrate the requirements for review whereas under harmless-error review, the state bears the burden to demonstrate that the error did not affect the defendant's substantial rights. Id. at ¶ 17-18. *See, State v. Bond*, 2022-Ohio-4150, ¶7.

{¶79}  In order to show that an error affected substantial rights, the defendant must demonstrate "a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis deleted.)  *State v. Rogers*, 2015-Ohio-2459, ¶ 22, *citing United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, (2004) (construing Fed.R.Crim.P. 52(b), the federal analog to Crim.R. 52(B)). *Bond* at ¶ 22.

*Allied-offenses of similar import – R.C. 2941.25*

{¶80} In Ohio, the legislative statement on multiple punishments is found in R.C. 2941.25, which provides:

(A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶81} This test requires a court to ask three questions: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of [these questions] will permit separate convictions. The conduct, the animus, and the import must all be considered." *State v. Ruff*, 2015-Ohio-995, ¶ 31. An allied-offenses analysis must be driven by the facts of each case. "[T]he analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import." Id.

{¶82} There are two circumstances in which offenses will be deemed dissimilar in import, making sentences for multiple counts permissible. The first circumstance is

"[w]hen a defendant's conduct victimizes more than one person [because] the harm for each person is separate and distinct." Id. at ¶ 26. The second circumstance is when a defendant's conduct against a single victim constitutes two or more offenses and "the harm that results from each offense is separate and identifiable from the harm of the other offense." Id. Therefore, the Ohio Supreme Court has held that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 26. Whether the offenses have similar import will be revealed by "[t]he evidences at trial or during a plea or sentencing hearing." Id.

**{¶83}** In *State v. Whitfield,* the Ohio Supreme Court cautioned trial courts as follows,

> Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, *the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. Thus, the trial court should not vacate or dismiss the guilt determination.*

2010-Ohio-2, ¶26. Emphasis added.

**Issue for Appellate Review:** *Whether R.C. 2941.25 allows multiple sentences for rape, gross sexual imposition and endangering children in Durham's case*

**{¶84}** Under R.C. 2907.02, the elements of rape as indicted in this case were:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is

living separate and apart from the offender, when any of the following applies:

…

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶85} Under R.C. 2907.05, the elements of gross sexual imposition as indicted in this case were:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

…

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶86} Under R.C. 2919.22, the elements of endangering children as indicted in this case were:

(B) No person shall do any of the following to a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age:

(1) Abuse the child

{¶87} Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or

any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."  R.C. 2907.01(A).

**{¶88}** Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  R.C. 2907.01(B).

**{¶89}** An "abused child" can be found where the child is the victim of "sexual activity" as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter. See, R.C. 2151.031.

*Rape and gross sexual imposition are not allied offenses under the facts*

*established during trial*

**{¶90}** Rape and gross sexual imposition may, depending on the circumstances, be allied offenses of similar import. *See, State v. Abi–Sarkis*, 41 Ohio App.3d 333 (one uninterrupted assaultive episode without a separate animus as to each act, R.C. 2941.25(A) permits only one conviction). *See also, State v. Teagarden*, 2008-Ohio-6986, ¶175 (5th Dist.).

**{¶91}** However, "simply because gross sexual imposition and rape may be allied offenses in one case does not mean that they are allied in every other case." *State v. Knight,* 2008-Ohio-579, at ¶ 47 (8th Dist.), *citing State v. Wozniak* (May 23, 1996), 10th Dist. No. 95APA03–345. There may be instances when a defendant may be convicted and sentenced for both charges.

{¶92}  In *Knight*, the testimony showed that the defendant had groped the victim's breast during the episode where he raped her. The *Knight* court determined that such conduct is separate from the conduct that constituted the rape offense. In *Knight*, the victim was penetrated both vaginally and anally, and the court determined that such conduct is "separate and distinct from the conduct that constituted the gross sexual imposition offense." Id. at ¶ 48. Therefore, the court concluded that Knight committed gross sexual imposition when he groped the victim's breast and that this was done with a separate animus from the sexual contact that led to the conviction for rape. Id. *citing State v. Reid*, 2004–Ohio–2018 (8th Dist.); *Teagarden*, 2008-Ohio-6986, ¶177. *See also, State v. Foust,* 2004-Ohio-7006, ¶144 (act of touching victims vagina with a knife was conduct separate and distinct from rape; therefore, defendant could be convicted of rape and gross sexual imposition).

{¶93}  In the case at bar, concerning Count 4 of the indictment alleging gross sexual imposition on June 14, 2022, Durham admitted that he applied lotion to T.D.'s breasts as well as her vagina. 4T. at 505-506.

{¶94}  Concerning Count 2 of the indictment alleging gross sexual imposition between January 1, 2022 and June 13, 2022, T.D. testified that during 2022 when the school year was ending, Durham touched her while she was naked in the shower squeezing her breasts, rubbing her vaginal area and putting his fingers inside her vaginal area. 2T. at 293. Durham admitted to telling Deputy Balash that he would scrub T.D. in the shower including her vaginal area. Id. at 605-606.

{¶95} Similarly, to *Knight* and *Teagarden,* we find under the facts established at trial, Durham's conduct of groping T.D.'s breasts was committed with separate animus than the counts of rape. *State v. Teagarden*, 2008-Ohio-6986, ¶178.

{¶96} Accordingly, we find that Durham has not demonstrated that any obvious error occurred in the failure to merge the rape and the gross sexual imposition counts for sentencing, or that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial. We decline to find a manifest injustice warranting the extraordinary step of finding plain error in the failure to merge the rape and gross sexual imposition counts for sentencing.

*Endangering children is an allied offense of rape and gross sexual imposition under the facts of this case*

{¶97} The state's sole argument for imposing a separate sentence for Durham's conviction for endangering children is *State v. Fisher,* 2023-Ohio-2693(8th Dist.). [Appellee's brief at 18]. We find the state's reliance on *Fisher* to be misplaced.

{¶98} In finding the offenses of rape, gross sexual imposition and endangering children do not merge for sentencing, the court in *Fisher* found, "Child endangering, pursuant to R.C. 2919.22, involves the duty of care and protection a parent or a person acting in *loco parentis* has with respect to a child." Id. at ¶8. However, that is true only with respect to R.C. 2919.22(A), not R.C. 2919.22(B). In order to convict a defendant of child endangering under R.C. 2919.22(A), the state must prove that: (1) an individual who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of; (2) a child under 18 years of age; (3) recklessly created a substantial risk to the health or safety of the child; and (4) by violating a duty of care, protection, or support.

To convict a defendant of child endangering under R.C. 2919.22(B)(1), the state must prove that: (1) the child is under 18 years of age; (2) an affirmative act of abuse occurred; and (3) the defendant recklessly committed the act of abuse. *State v. Garcia*, 2004–Ohio–1409, ¶ 36 (10th Dist.); *State v. Carse*, 2010-Ohio-4513, ¶ 54 (10th Dist.). Only a certain, defined group of people who violate a duty of care, protection or support can violate R.C. 2919.22(A); however, one can recklessly abuse a child in violation of R.C. 2919.22(B)(1) without violating a duty of care as required by R.C. 2919.22(A). *Garcia,* ¶ 36.

{¶99} In the case at bar, the state did not charge Durham with a violation of R.C. 2919.22(A); rather Durham was indicted and convicted of Endangering Children under R.C. 2919.22(B)(1). At trial, the charge of Endangering Children was predicated upon Durham's "sexual abuse" of T.D. *See, e.g.* 5T. at 635-636. No separate animus or separate harm stemming from the endangering children charge was alleged or proven.

{¶100} Accordingly, Durham's convictions for endangering children in count five of the indictment should be merged for purposes of sentencing. As such, this matter must be remanded to the trial court for resentencing. *Teagarden,* 2008-Ohio-6985, ¶ 178.

{¶101} Durham's Third Assignment of Error is overruled in part, and affirmed in part.

IV.

{¶102} In his Fourth Assignment of Error, Durham contends the prosecutor committed error during closing argument by improperly bolstering a state's witness and misstating the evidence thereby depriving him of a fair trial.

{¶103} Durham did not object to the comments he now assigns as error. Therefore, he has forfeited all but plain error.

**Standard of Appellate Review – Plain Error**

{¶104} Recently, the Ohio Supreme Court reviewed claims of plain error and stated,

> To prevail under the plain-error standard, the defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights. Crim.R. 52(B); State *v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only when it affects the outcome of the trial). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*State v. Nicholson,* 2024-Ohio-604, ¶114. *See also, State v. Knuff,* 2024-Ohio-902, ¶117.

{¶105} In *Knuff*, the Supreme Court addressed the appropriate standard of review for addressing claims of prosecutorial misconduct during closing argument,

> We assess prosecutorial misconduct in closing arguments by asking "'whether the remarks were improper and, if so, whether they prejudicially affected [the] substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), *quoting State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). A conviction may be upheld in the face of a prosecutor's improper remarks when it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" regardless of the comments. *United States v. Hasting*, 461 U.S. 499, 511-512, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (new trial unwarranted despite prosecutor's

improper argument because of "overwhelming evidence of guilt and the inconsistency of the scanty evidence tendered by the defendants").

*State v. Knuff,* 2024-Ohio-902, ¶238.

**Issue for Appellate Review:** *Whether but for the prosecutor's remarks during closing argument the jury would have acquitted Durham.*

**{¶106}** Durham points to only the two following remarks made by the prosecutor during closing argument,

> T.D. tells you that, you know, he, when she doesn't do exactly what he wants her to do, she gets hit with a belt. Guess what? Her mom and dad admitted, she gets hit with a belt, gets hit with a belt often. That's the truth.... She's been consistent throughout this entire case. They wanted to make her out to be a liar but she didn't lie. She did what Carrie Schnirring said, she let her story gradually come out and why is that? Because you want to know, you're twelve years old, am I going to go home to a safe place or is no one going to believe me and I'm going to go home to an unsafe place and who can blame her really, that it already happened to her. She told the truth and her life was unsafe. She told the truth and initially her mother believed her but then her mother put her time and time again in the presence of Enrique.

5T. at 637. And again, during her rebuttal closing argument,

> You shouldn't find a guilty man innocent because he lies. It's not the weight of the lies. It's not the - It's the nature of the lies. It's the reasonableness of what you heard. [H.C.], according to [defense counsel],

lied because she wasn't honest about being physically abusive to her daughter. Because who wants to be labeled as a physically abusive mother? Nobody. And she told you, she not proud of that. Frankly, she doesn't even know if she's going; to get her daughters. I mean, she has no idea whether she's going to get her daughters back. She didn't come in here [sic] lie. She spent a lot of time lying for Enrique which is the reason why she ended up in this position, which is the reason why she doesn't have her daughters. [T.D.] didn't lie…. She got caught in a predicament and she told the truth and then she gradually disclosed about, frankly, what sounds like a pretty horrible household of secrets and violence and sexual abuse. Who has the most reason to lie? Who has said over and over again, my entire life is crumbling, I'm losing everything, I've worked so hard, you know, and now, I'll do anything to fix this. I need to fix this. Well, first I'll lie about it and say it didn't happen. Next, I'll call - Next, I'll say we have a broken family so now my child is lying, which doesn't make any sense. Then I'll look at these jurors square in the eye and say I only rub lotion on her pubic area, which again is a crime, but he's minimizing to maximize his chance of you believing him. I hope that you're smarter than that and I am asking you to find Enrique guilty for his actions, guilty for the trauma he put this child through and I hope we'll come into the courtroom and hear that verdict. Thank you.

    …

5T. at 644-645.

**{¶107}** Courts afford prosecutors wide latitude in closing arguments, and prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments. *State v. Hunt*, 10th Dist. No. 12AP-1037, 2013-Ohio-5326, 2013 WL 6406316, ¶ 18. As a general rule "[i]t is improper for an attorney to express his or her own personal belief or opinion as to the credibility of a witness." *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). A prosecutor improperly vouches for the credibility of a witness "'when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue.'" *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 200, *quoting State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232.

**{¶108}** Even if we were to assume *arguendo* that the prosecutor's statements were improper, Durham is unable to demonstrate the type of prejudice necessary to require reversal based on plain error from prosecutorial misconduct. *See State v. Guade*, 10th 2012-Ohio-1423, ¶ 20. "An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. McAlpin*, 2022-Ohio-1567, ¶168, citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001).

**{¶109}** Durham was not deprived of a fair trial due to prosecutorial misconduct. The evidence against Durham was compelling, and there is little chance that, absent the improper comments, the result of his trial would have been different. Because T.D. and H.C. testified, the jury was able to judge for themselves the witness's appearance on the stand, manner of testifying, the reasonableness of their testimony, the accuracy of memory, frankness or lack of it, and any bias T.D. or H.C. may have. The jury further

heard the tape-recorded interview Durham gave to Deputy Balash and observed Durham testify during trial subject to cross-examination. Also, any potential prejudice was mitigated by the trial court's instruction to the jury that closing arguments are not evidence. *McAlpin*, 169 Ohio St.3d 279, ¶ 188, *citing State v. Jones*, 91 Ohio St.3d at 353 (2001).

{¶110} Durham has not demonstrated that the jury abandoned their oaths, their integrity or the trial court's instructions and found him guilty based upon the prosecutor's statements. It is clear beyond a reasonable doubt that the jury would have returned a verdict of "guilty" regardless of the comments.

{¶111} Durham's Fourth Assignment of Error is overruled.

## V.

{¶112} In his Fifth Assignment of Error, Durham contends the trial judge miscalculated his sentence.

{¶113} In light of our disposition of Durham's Third Assignment of Error in which we remand Durham's case for resentencing, we find Durham's Fifth Assignment of Error to be premature.

{¶114} Durham's Fifth Assignment of Error is overruled.

## VI.

{¶115} In his Sixth Assignment of Error, Durham argues the cumulative effect of the erroneous admission of evidence and, the prosecutor's misconduct, resulted in the denial of Durham's right to a fair trial.

{¶116} In State *v. Brown*, 2003-Ohio-5059, the Ohio Supreme Court recognized the doctrine of cumulative error. The cumulative error doctrine does not apply, however,

where the defendant "cannot point to 'multiple instances of harmless error.'" *State v. Mammone*, 2014-Ohio-1942, ¶ 148 *quoting State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

**{¶117}** In the instant case, we have found just one instance of error in failing to merge the Endangering Children count with the Gross Sexual Imposition and Rape counts. The doctrine of cumulative error is therefore inapplicable. We conclude that the cumulative effect of the failure to merge is also harmless because it did not materially affect the verdict. *State v. Leonard,* 2004-Ohio-6235, ¶ 185.

**{¶118}** Durham's Sixth Assignment of Error is overruled.

### Conclusion

**{¶119}** Durham's First, Second, Fourth, Fifth and Sixth Assignments of Error are overruled.

**{¶120}** Durham's Third Assignment of Error is sustained and we remand this matter solely for purposes of merging the Endangering Children count with the Gross Sexual Imposition and Rape counts and, resentencing Durham accordingly.

**{¶121}** This decision in no way affects the guilty verdicts and sentences issued by the jury on any other count of the indictment. It only affects the sentence with the sole purpose of merging the Endangering Children count with the Gross Sexual Imposition and Rape counts, and resentencing Durham accordingly.

{¶122} The decision of the Tuscarawas County Court of Common Pleas is affirmed in all other respects.

By Gwin, P.J.,

Wise, J., and

King, J., concur